UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA, ex rel.
MARIANNE D. GUZALL, and MARIANNE
D. GUZALL a/k/a MARIANNA GUZALL,
individually,

            Plaintiff,                      Civil Case No. 13-cv-11327
                                                  Honorable Linda V. Parker

v.

CITY OF ROMULUS, ALAN R. LAMBERT,
and BETSEY KRAMPITZ,

            Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Marianne D. Guzall ("Ms. Guzall"), a former employee of Defendant City of

Romulus ("City" or "Romulus"), filed this lawsuit against Defendants as a qui tam

action alleging violations of the federal False Claims Act ("FCA"), and as an

individual action alleging violations of her rights under federal and state law.

Specifically, Ms. Guzall alleges the following counts in her four hundred and twelve

paragraph Amended Complaint:

(I)      Retaliation and Retaliatory Discharge in Violation of 31 U.S.C.
         § 3730(h), public policy, and the First Amendment to the U.S.
         Constitution;

(II)     Violation of Federal False Claims Act - Qui Tam and (RICO)
         Racketeer Influenced and Corrupt Organizations Act;

(III)   Promissory Estoppel;

(IV)   Due Process Violation and Hostile Work Environment Claim;

(V)   Intentional Infliction of Emotional Distress;

(VI)   Fraud - Intentional and/or Constructive Fraud - Conspiracy and Concert of Actions.

(Pl.'s Am. Compl., ECF No. 4.)   Defendants are the City, the City's former mayor Alan R. Lambert ("Mayor Lambert"), and the City's former chief of staff Betsey Krampitz ("Ms. Krampitz").   The matter presently is before the Court on separate motions for summary judgment filed by Defendants.   (ECF Nos. 153, 154, 171.) The motions have been fully briefed.   Finding the facts and the parties' legal arguments sufficiently presented in their submissions, the Court is dispensing with oral argument with respect to the motions pursuant to Eastern District of Michigan Local Rule 7.1.

## I.    Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986).   After adequate time for discovery and upon motion, Rule 56

mandates summary judgment against a party who fails to establish the existence of

an element essential to that party's case and on which that party bears the burden of

proof at trial.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue

of material fact."   *Id*. at 323.   Once the movant meets this burden, the "nonmoving

party must come forward with specific facts showing that there is a genuine issue for

trial."   *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986) (internal quotation marks and citation omitted).   To demonstrate a genuine

issue, the nonmoving party must present sufficient evidence upon which a jury could

reasonably find for that party; a "scintilla of evidence" is insufficient.   *See Liberty

Lobby*, 477 U.S. at 252.   The court must accept as true the non-movant's evidence

and draw "all justifiable inferences" in the non-movant's favor.   *See Liberty Lobby*,

477 U.S. at 255.

"A party asserting that a fact cannot be or is genuinely disputed" must

designate specifically the materials in the record supporting the assertion, "including

depositions, documents, electronically stored information, affidavits or declarations,

stipulations, admissions, interrogatory answers, or other materials."   Fed. R. Civ. P.

56(c)(1).   Rule 56 provides that "[a]n affidavit or declaration used to support or

oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated." Fed. R. Civ. P. 56(c)(4). "In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (internal quotations and brackets omitted).

Notably, the trial court is not required to construct a party's argument from the record or search out facts from the record supporting those arguments. *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."). The parties are required to designate with specificity the portions of the record such that the court can "readily identify the facts upon which the . . . party relies[.]" *InterRoyal Corp.*, 889 F.2d at

111.

## II.     Factual and Procedural Background

In 2001, Mayor Lambert was elected mayor of Romulus.   Upon his election, Mayor Lambert hired Ms. Krampitz to serve in an administrative position similar to the one she held under a previous mayor.   In November 2001, Mayor Lambert hired Ms. Guzall to serve as his administrative assistant.   This was the most junior position within the office.   (Guzall 12/4/15 Dep. at 28, ECF No. 154-4.)   Ms. Guzall had no prior experience working for the City.

The City of Romulus Charter provides that "[t]here shall be administrative secretaries for the Mayor, Clerk and Treasurer.   They shall be hired by the official they serve.   They will be non-union and non-civil service."   (Lambert's Mot., Ex. B, ECF No. 171-3.)   During her deposition in this matter, Ms. Guzall acknowledged that she served in an appointed position at the pleasure of the mayor and was not subject to union membership.   (Guzall 12/4/15 Dep. at 30-31, ECF No. 154-4.) Relying on the language of the City of Romulus Charter, however, Ms. Guzall asserted that she was not an at-will employee and could be terminated only for cause.   (*Id*. at 28.)   Specifically, Ms. Guzall testified that the City's finance director, Debra Hoffman, and its human resources director, Carol Mayerich, told her that her "job was protected by the city charter." (*Id*.)

In 2006, Mayor Lambert promoted Ms. Krampitz to serve as his chief of staff, and he hired Julie Wojtylko ("Ms. Wojtylko") to fill the position Ms. Krampitz previously occupied. (Wojtylko Dep. at 8, 13, ECF No. 154-3; Krampitz Dep. at 10-11, ECF No. 154-2.) Ms. Guzall was passed over for the promotion given to Ms. Wojtylko, which Ms. Guzall had expected to receive. (Guzall 12/4/15 Dep. at 57, ECF No. 154-4.) Ms. Wojtylko began working for Romulus through a co-op program at her high school in 1985, and she held various positions throughout the City before Mayor Lambert hired her. (Wojtylko Dep. at 11-13, ECF No. 154-3.)

In her Complaint and during her deposition, Ms. Guzall contends that Mayor Lambert, Ms. Krampitz, other City officials and employees, and several Romulus residents engaged in improper and/or illegal acts during Ms. Guzall's tenure with the City. For example, Ms. Guzall claims that Mayor Lambert and Ms. Krampitz listed, or directed other employees to list, individuals as donors on campaign finance reports when, according to Ms. Guzall, those individuals did not donate money to Mayor Lambert's campaign. Ms. Guzall also claims that Mayor Lambert and Ms. Krampitz failed to deposit and report cash donations and directed employees to use Romulus supplies and work on Mayor Lambert's campaign during city business hours. According to Ms. Guzall, she reported this misconduct to the City's Attorney, Barry Seifman, but he did nothing.

Beginning in 2009, Romulus, like many other Michigan municipalities, began

experiencing a shortfall in revenue due to a decrease in funds received from the state and from property taxes.[1]   (Hoffman Aff. ¶¶ 3-4, ECF No. 154-5; Audia Aff. ¶¶ 7-8, ECF No. 154-15.)   By the end of 2009, Romulus faced a five-year financial deficit forecast of approximately $20 million.   (Hoffman Aff. ¶ 5; Audia Aff. ¶ 9.) To address the shortfall, Romulus formed the Action in Changing Times Committee ("ACT NOW Task Force") to propose cost-saving and revenue enhancing measures. (Hoffman Aff. ¶¶ 6-7; Audia Aff. ¶¶ 10-11; Krampitz Mot., Ex. E, ECF No. 154-6.) A facilitator from the consulting firm Plante Moran moderated the ACT NOW Task Force, which consisted of elected City officials, school officials, union representatives, city department heads, business leaders, and community representatives and religious leaders.   (Krampitz Mot., Ex. E, ECF No. 154-6.)

Within this context, Romulus decided to lay off twenty-eight full-time city employees between June and August 2010.   (Mayerich Aff. ¶ 5, ECF No. 154-7; Hoffman Aff. ¶ 8.)   The record fails to reflect who decided which positions would be eliminated; however, the City's finance director, Debra Hoffman, attests in her

---

[1] During her deposition and in response to Defendants' motions, Ms. Guzall asserts that the City's claimed financial distress was a sham to secure higher salaries for its officials and to make the City's "residents … feel a crunch, so that they would vote the millage through."   (6/28/16 Guzall Dep. at 63, 70.)   Ms. Guzall presents no evidence to support her assertion, however.   Moreover, in light of the record evidence and this Court's ability to take judicial notice of the financial crisis felt globally during this period, it finds Ms. Guzall's analysis of Romulus' financial condition unbelievable.

affidavit that these decisions "were made and ultimately agreed upon collectively and objectively by a team of persons representing the various departments." (Hoffman Aff. ¶ 15.) Among the employees laid off between June and August 2010 were City police officers, firefighters, and department of public works employees. (Mayerich Aff. ¶ 6.) No one in the mayor's office was impacted by the layoffs. (*Id*. ¶ 9.) The City further reduced its costs by reducing the hours of its senior center and closing the public library and recreation department between June and August 2010. (*Id*. ¶¶ 7-8.)

Seeking to avoid additional cuts to city personnel and services, in August 2010, Romulus voters were asked to approve a millage increase to pay for police and fire services. (Hoffman Aff. ¶ 9.) The voters rejected the increase. (*Id*. ¶ 10.) On November 8, 2010, the Romulus City Council voted to hold a special election on a 2.75 millage increase proposal for general operation services in February 2011. (*Id*. ¶ 12; 11/8/10 Romulus Council Meeting Minutes, ECF No. 154-8.) In the event the millage did not pass, the City prepared to implement a second reduction-in-force, laying off an additional nine full-time employees and three part-time employees. (Mayerich Aff. ¶ 10.) Notices to the targeted employees informed them that they were being laid off effective March 11, 2011 due to budget cuts, but that the notice would be rescinded if Romulus residents voted in favor of the millage on February 22, 2011. (*Id*. ¶ 14; Wojtylko Dep. at 185, ECF No.

154-3.)

Ms. Guzall was among the employees laid off during this second reduction-in-force. (Mayerich Aff. ¶ 11.) According to Carol Mayerich, the City's director of human resources from 2007-2013, she told Mayor Lambert that the March 2011 reduction-in-force needed to include one position in his office and thus an existing member of his staff. (*Id*. ¶ 12.) Ms. Guzall's position was selected for elimination because it would have the least impact on the continued operation of the mayor's office. (*Id*. ¶ 13.) The parties fail to identify who, specifically, made this determination or was part of the team making the layoff decisions.[2] The Court was unable to glean this information through its independent review of the record evidence.

According to Ms. Guzall, "they" told her not to clean out her desk and that she would be brought back to work within three months of being laid off. (Guzall 6/28/16 Dep. at 53.) Ms. Guzall testified that Mayor Lambert told her not to look

---

[2] Ms. Guzall testified during her deposition that her layoff was discussed at a meeting attended by Tim Keyes, Mayor Lambert, Betsey Krampitz, Julie Wojtylko, Debra Hoffman, and Leroy Burcroff, and that Mr. Burcroff "brought [Ms. Guzall's] name up." (Guzall 12/4/15 Dep. at 127.) This testimony constitutes inadmissible hearsay, however, as Ms. Guzall was not at the meeting and testified that she was told this by Ms. Wojtylko. (*Id*.) Further, even if Ms. Wojtylko told Ms. Guzall that Mayor Pro Tem Burcroff brought up Ms. Guzall's name, it does not demonstrate that he did so to include her in the layoffs. Moreover, Ms. Guzall is not even certain when this meeting occurred. (*Id*. at 126.) As such, it may not have resulted in her layoff or may have occurred before Ms. Guzall reported the alleged misconduct to Mayor Pro Tem Burcroff.

for another job because if they could not find a position for her in his office, they would let her float between the mayor's office, clerk's office, and human resources. (*Id*. at 80.)   Romulus did not return Ms. Guzall to work, however.   Over time, some laid off employees did regain employment.   (Guzall 12/4/15 Dep. at 81.) However, no employee assumed Ms. Guzall's former position.[3]   (Mayerich Aff. ¶ 16, ECF No. 1543-4.)

Prior to her layoff, Ms. Guzall had several discussions that she believes were the cause of the layoff decision.   First, in May 2010, while Ms. Guzall was on vacation, she received a telephone call from Ms. Wojtylko who was upset because the Michigan State Police had contacted her for an interview in connection with its investigation of the Romulus Police Department.   (Guzall 6/28/16 Dep. at 54-55, ECF No. 154-4.)   According to Ms. Guzall, she told Ms. Wojtylko that Ms. Wojtylko should not lie for anyone and that she (Ms. Guzall) would not lie for the mayor. (*Id*. at 54-55, 59.)

Ms. Guzall further testified that on the day she returned from her vacation, she spoke to Ms. Wojtylko and Ms. Krampitz about the Michigan State Police investigation and again stated that, if interviewed, she would tell the truth.   (*Id*. at

---

[3] Ms. Guzall asserts that Jill Lambert, who also was laid off during the second reduction-in-force, assumed Ms. Guzall's previous position in the mayor's office. The evidence reflects, however, that Ms. Lambert was re-hired on a temporary basis to fill in for Ms. Wojtylko while Ms. Wojtylko was on medical leave.   (Wojtylko Dep. at 160; ECF No. 154-3 at Pg ID 2736.)

53-54, 59, 77.)   According to Ms. Guzall, Ms. Krampitz responded, "we're gonna give you a pink slip today" and then she gave Ms. Guzall a pink slip.[4]   (*Id*.)   Ms. Guzall testified, "They said they would give me a box to pack my stuff if I didn't lie."   (*Id*. at 81.)

This last exchange apparently occurred when the City was deciding who would be laid off during the first reduction-in-force in June 2010.   (*Id*. at 108.)   In fact, Ms. Guzall testified that when Ms. Krampitz gave her the pink slip, they were headed into a meeting where other employees' names would be called to receive a pink slip, but hers was "just for show."   (*Id*. at 78.)   Despite allegedly receiving this pink slip, Ms. Guzall was not laid off at this time.

According to Ms. Guzall, some time prior to when she in fact was laid off, she met with Leroy Burcroff, mayor pro tem and chairman of the city council ("Mayor Pro Tem Burcroff"), and told him about the illegal and/or improper activities in the mayor's office.[5]   (6/28/16 Guzall Dep. at 112-13, ECF No. 154-4.)   Ms. Guzall

_____

[4] When Ms. Guzall first testified about this exchange, she claimed that it occurred during a telephone conversation with Ms. Krampitz while Ms. Guzall was on vacation.   (6/28/16 Guzall Dep. at 53-54, 59.)   It makes more sense that it occurred after Ms. Guzall returned to work, as she also claims that, in response, Ms. Krampitz handed her a pink slip and that they were going into a departmental meeting.   (*Id*. at 77-78.)

[5] In her response brief, Ms. Guzall states that her meeting with Mayor Pro Tem Burcroff occurred within three months of her termination.   (*See, e.g.*, Pl.'s Resp. Br. to Lambert's Mot. at 2, ECF No. 175 at Pg ID 4419.)   During her deposition, however, Ms. Guzall could not specifically recall when this meeting occurred.   (*Id*.

believes Mayor Pro Tem Burcroff told Mayor Lambert about their conversation because the day after she met with Mayor Pro Tem Burcroff, Ms. Krampitz came to Ms. Guzall and said: "Just remember, Mr. Burcroff's a politician and he talks."  (*Id.* at 118.)   Plaintiff explained, "she [Ms. Krampitz] looked right at me, and it was—I just knew that she knew."  (*Id.*)

On May 3, 2012, three months after Ms. Guzall was laid off, the Michigan State Police interviewed her in connection with its investigation of wrongdoing within the City.   (Lambert's Mot., Ex. J, ECF No. 171-11.)   Apparently, the initial investigation into misconduct within the Romulus Police Department uncovered suspected illegalities within the mayor's office.   (City's Mot., Ex. 11, ECF No. 153-12.)

## III.    Applicable Law and Analysis

### A.    Retaliation in Violation of the First Amendment

#### 1.    Applicable Law

In Count I of her Amended Complaint, Ms. Guzall asserts that she was laid off in retaliation for her speech in violation of the First Amendment to the United States

---

at 113.)   She also could not remember if the meeting occurred before or after she received the notice that she was being laid off.   (*Id.*)   Although a specific time frame may be included in her Amended Complaint, the pleading is not—despite Ms. Guzall's contrary assertion—a "verified" complaint, as it lacks the required verifying language.   *See Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992); 28 U.S.C. § 1746.

Constitution.

"A public employee has a constitutional right to comment on matters of public concern without fear of reprisal from the government as employer." *Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003) (citing *Connick v. Myers*, 461 U.S. 138, 140, 145-46 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1986)). " 'Retaliation by a government employer against an individual who exercises h[er] First Amendment rights constitutes a First Amendment violation.' " *Id.* (quoting *Perry v. McGinnis*, 209 F.3d 597, 604 (6th Cir. 2000)). The Sixth Circuit utilizes a three-step test for evaluating a public employee's First Amendment retaliation claim:

> First, the employee must establish that his speech is protected. To accomplish this, the employee must show that his speech touches on a matter of public concern, *Connick*, 461 U.S. at 147, 103 S. Ct. 1684, and demonstrate that his interest in the speech outweighs the government's countervailing interest in promoting the efficiency of the public service it provides as an employer. *Pickering*, 391 U.S. at 574, 88 S. Ct. 1731. This determination is a question of law for the court to decide. *Connick*, 461 U.S. at 148 n. 10, 103 S. Ct. 1684. Second, the employee must show that the employer's adverse action would chill an ordinary person in the exercise of his First Amendment rights. *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th. Cir. 2001). Finally, the employee must present sufficient evidence to create a genuine issue as to whether his speech was a substantial or motivating factor in the employer's decision to discipline or dismiss. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L.Ed.2d 471 (1977).

*Taylor*, 338 F.3d at 643.

With respect to the first prong, the plaintiff need not have spoken to the press

or the public for her speech to be protected. *Id*. (citing *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 412 (1979)); *see also, e.g.*, *Perry v. McGinnis*, 209 F.3d 597, 608 (6th Cir. 2000). Thus in *Taylor*, the Sixth Circuit held that the First Amendment protected reports and statements the plaintiffs, a police officer and police sergeant, made internally to other members of their police department. *Id*. Similarly, in *Perry*, the appellate court held that the plaintiff's complaints about a matter of public concern made in private conversations to his supervisors were protected. 209 F.3d at 608. As the Supreme Court reasoned in *Givhan*: "Neither the [First] Amendment itself nor our decisions indicate that [freedom of speech] is lost to the public employee who arranges to communicate with his employer rather than to spread his views before the public." 439 U.S. at 415-16.

Speech touches upon a matter of public concern if it can be "fairly considered as relating to any matter of political, social or other concern to the community." *Connick*, 461 U.S. at 146. "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of a personal interest," his or her speech is not entitled to constitutional protection. *Id*. at 147. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the record as a whole." *Id*. at 147-48. The Sixth Circuit has held that "speech disclosing public corruption is a matter of public interest." *Solomon v. Royal Oak*

*Twp.*, 842 F.2d 862, 865 (6th Cir. 1998); *see also Marohnic v. Walker*, 800 F.2d 191 (6th Cir. 1986) (stating that "[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law").

To satisfy the third prong of this three-part test, the plaintiff " 'cannot rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent.' " *Taylor*, 338 F.3d at 646 (quoting *Cockrel*, 270 F.3d at 1055). "Rather, to survive a motion for summary judgment, the employee must present sufficient evidence linking his [or her] speech to the employer's adverse decision so that a reasonable factfinder could conclude, by a preponderance of the evidence, that the speech, at least in part, motivated the decision to discharge." *Id.*

### 2. Analysis

Defendants uniformly argue that Ms. Guzall cannot establish the third element necessary to establish her First Amendment retaliation claim: causation. This Court agrees.

First, Ms. Guzall presents no probative evidence to show that Ms. Krampitz or Mayor Lambert were involved in the City's lay-off decisions or that anyone involved in the decision was aware of Ms. Guzall's alleged protected conduct.[6] Ms.

---

[6] Ms. Guzall argues that Ms. Krampitz had the ability to terminate her employment, relying on Ms. Guzall's deposition testimony as proof of this asserted fact. (Guzall 12/4/15 Dep. at 78-79.) Even if true, Ms. Guzall fails to present evidence to show that Ms. Krampitz in fact was involved in the layoff decisions. As stated in Section

Guzall professed during her deposition that the mayor had the final say as to who would be laid off. (6/28/16 Guzall Dep. at 70-71.) She presents no evidence to support this assertion, however, and her deposition testimony reflects that this is her subjective belief based on nothing more than speculation.

Ms. Guzall claims that Ms. Krampitz gave her a "pink slip" in May 2010, after Ms. Guzall stated that she would not lie if interviewed by the Michigan State Police. As an initial matter, Ms. Guzall's broad statement that she would tell the truth if interviewed, without any elaboration regarding what she would reveal, does not establish that she spoke on a matter of public concern entitling her to First Amendment protection. In any event, this "pink slip" did not result in Ms. Guzall suffering an adverse action. The span of time between this interaction and Ms. Guzall's actual layoff in early 2011 is too long to conclude, without more, that Ms. Guzall's statement motivated the layoff decision. *See Clark Cty. Sch. Distr. v. Breeden*, 532 U.S. 268, 273 (2001) (explaining that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close,' " and

I, a trial court has no duty to search out facts from the record supporting a party's arguments. *Street*, 886 F.2d at 1479-80. Nevertheless, this Court independently scoured the record to determine if it contained such evidence, along with the other evidence Ms. Guzall failed to identify to prove her claims. It found the evidence lacking.

citing cases finding three and four month gap insufficient); *see also Clay v. United Parcel Serv., Inc.*, 501 F.3d 695 (6th Cir. 2007) (holding temporal proximity of six months between the filing of the plaintiff's EEOC complaint and his termination insufficient to satisfy causation element); *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000) (finding one-month gap, without more, insufficient to establish causation).

Even if there was evidence to support Ms. Guzall's assertion that she was laid off a few months after reporting improper and/or illegal activities in the mayor's office to Mayor Pro Tem Burcroff, Ms. Guzall's assertion that Mr. Burcroff made the decision to include her in the layoff is based on hearsay and pure speculation and conjecture.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-85 (6th Cir. 1992) (providing that rumors, conclusory allegations, and subjective beliefs are insufficient to create a genuine issue of material fact).

During her deposition, when asked if she had any facts suggesting that Mr. Burcroff had any input into the decision to include her in the second round of layoffs, Ms. Guzall responded: "He was in the meeting where they determined who was going to be laid off."   (Guzall 12/4/15 Dep. at 124.)   Ms. Guzall indicated that she was not at the meeting, but Ms. Wojtylko "told [Ms. Guzall]."   (*Id.*)   What precisely Ms. Wojtylko told Ms. Guzall is unclear from Ms. Guzall's deposition testimony.   Further, what Ms. Wojtylko told Ms. Guzall constitutes inadmissible

hearsay and there is no indication from Ms. Wojtylko's deposition that she would support Ms. Guzall's assertion.

To demonstrate a connection between her speech and layoff, Ms. Guzall relies heavily on Virginia Williams' affidavit, in which Ms. Williams states that she "had several conversations with Betsey Krampitz regarding the employment of Marianne Guzall." (Williams Aff. ¶ 2, ECF No. 123-6.) There are multiple levels of inadmissible hearsay within Ms. Williams' affidavit, and her conclusion that "[Ms.] Guzall was wrongfully fired/laid off" is mere speculation and conjecture. As such, her statements are insufficient to establish that Ms. Guzall was terminated because of her protected activity. *See* Fed. R. Civ. P. 56(e); *Mitchell*, 964 F.2d at 584-85. Moreover, Ms. Williams' affidavit does not establish that any individual who purportedly stated that Ms. Guzall "had to be let go" because she "talks too much" or because she complained to Mayor Pro Tem Burcroff was involved in the layoff decision.

Ms. Guzall is correct that a defendant may be liable under 42 U.S.C. § 1983 even if the defendant did not execute the adverse action, but if his or her acts gave rise to the ultimate harm. *See, e.g., King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012). Yet, Ms. Guzall lacks evidence to show that Ms. Krampitz or Mayor Lambert took any action that gave rise to the decision to lay her off. Her assumption or speculation that they influenced the decision is insufficient to survive

summary judgment.

For these reasons, the Court concludes that Defendants are entitled to summary judgment with respect to Ms. Guzall's First Amendment retaliation claim.[7]

### B. Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h)

#### 1. Applicable Law

"Under the FCA, it is illegal to present a false claim for payment to the [federal] government."[8]   *United States ex rel. Antoon v. Cleveland Clinic Found.*,

---

[7] In response to Defendants' summary judgment motions, Ms. Guzall asserts that she alleged a separate violation of public policy claim based on her retaliatory discharge.   Such a claim fails for the same reason as her First Amendment retaliation claim—that is, she cannot show that she was laid off because of her protected speech.   *See Hoven v. Walgreen Co.*, 751 F.3d 778, 784 (6th Cir. 2014) (setting forth the elements of a public policy claim under Michigan law).

[8] The FCA imposes liability on an individual who:

A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

788 F.3d 605, 613 (6th Cir. 2015) (citing 31 U.S.C. § 3729(a)(1)) (brackets added

and emphasis removed).   The FCA also protects "whistleblowers" who expose such

fraud against the United States government.   *See* 31 U.S.C. §§ 3720-3730.   Section

3730 of the FCA states, in pertinent part:

> Any employee, contractor, or agent shall be entitled to all relief
> necessary to make that employee, contractor, or agent whole, if that
> employee, contractor, or agent is discharged, demoted, suspended,
> threatened, harassed, or in any other manner discriminated against in
> the terms and conditions of employment because of lawful acts done by
> the employee, contractor, agent or associated others in furtherance of
> an action under this section or other efforts to stop 1 or more violations
> of this subchapter.

31 U.S.C. § 3730(h)(1).

A retaliation claim brought under the FCA, 31 U.S.C. § 3730(h), overlaps a

---

> (E) is authorized to make or deliver a document certifying receipt of
> property used, or to be used, by the Government and, intending to
> defraud the Government, makes or delivers the receipt without
> completely knowing that the information on the receipt is true;
>
> (F) knowingly buys, or receives as a pledge of an obligation or debt,
> public property from an officer or employee of the Government, or a
> member of the Armed Forces, who lawfully may not sell or pledge
> property; or
>
> (G) knowingly makes, uses, or causes to be made or used, a false record
> or statement material to an obligation to pay or transmit money or
> property to the Government, or knowingly conceals or knowingly and
> improperly avoids or decreases an obligation to pay or transmit money
> or property to the Government,

31 U.S.C. § 3729.

First Amendment retaliation claim in that the plaintiff must show that she engaged in

protected activity known to her employer and that the employer took an adverse

action against the plaintiff as a result of the protected activity.   *McKenzie v.

BellSouth Telecomms., Inc.*, 219 F.3d 508, 514 (6th Cir. 2000) (citations omitted).

Protected activity under the FCA is limited, however, to activity "done … in

furtherance of an action under [31 U.S.C. § 3730] or other efforts to stop 1 or more

violations of this subchapter."   31 U.S.C. § 3730(h)(1).   The Sixth Circuit has held

that courts should "broadly construe the plaintiff's protected activity[.]"

*McKenzie*, 219 F.3d at 515.   Nevertheless, the court also cautioned that this "does

not eliminate the necessity that the actions be reasonably connected to the FCA" and

"that they relate to exposing fraud or involvement with a false claims disclosure."

*Id*. at 515-16 (quotation marks and citations omitted).

## 2.     Analysis

For the reasons discussed with respect to Ms. Guzall's First Amendment retaliation claim, she fails to create a genuine issue of material fact with respect to whether Defendants took an adverse action against her *because of* protected activity. Moreover, Ms. Guzall fails to establish that she even engaged in activity protected under the FCA.   Neither Ms. Guzall's Amended Complaint nor her deposition testimony suggest that she disclosed evidence of fraud on the federal government with respect to claims for payment.[9] (*See* Am. Compl. ¶¶ 237-244, 247-275, 285.) Merely reporting wrongdoing by supervisors is not protected activity.  *McKenzie*, 219 F.3d at 516 *Id*. (citing cases).   "[T]he internal reports must allege fraud on the [federal] government."   *Id*.   Finally, the public disclosure bar precludes Ms. Guzall's FCA retaliation claim.

The FCA places several restrictions on a relator's ability to bring a qui tam action, one of which is the public-disclosure bar in 31 U.S.C. § 3730(e)(4)(A).[10]

_____

[9] A review of Ms. Guzall's Amended Complaint and her deposition testimony reflects that she believes Defendants violated the FCA by making fraudulent statements on campaign finance reports and/or by failing to report income on tax returns. It is unclear how the former relates to claims for payments from the federal government.   While a false statement on a tax return could result in a payment (i.e., a tax refund) from the federal government, the FCA expressly excludes from its applicability "claims, records, or statements made under the Internal Revenue Code of 1986."   31 U.S.C. § 3729(d).

[10] Congress amended the FCA in March 2010 and these amendments modified several aspects of the public disclosure bar.   The 2010 FCA amendments do not

Section 3730(e)(4)(A) describes three types of disclosures that strip the courts of jurisdiction:

> "No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions [1] in a criminal, civil, or administrative hearing, [2] in a congressional, administrative, or Government Accounting Office [ (GAO) ] report, hearing, audit, or investigation, or [3] from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source [4] of the information."

*Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 286 (2010) (brackets in original) (quoting 31 U.S.C. § 3730(e)(4)(A) (1986) (footnote omitted)).   Pursuant to this provision, "when the basis of the lawsuit has been publicly disclosed in advance, the person filing the action must be the original source of the information that a false claim has been presented." *Antoon*, 788 F.3d at 614 (citing *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 507 (6th Cir. 2009)).   If the relator cannot establish that she is an original source of the information, the court (under the pre-2010 version of the statute) lacks subject matter jurisdiction and must dismiss the action.[11]   31 U.S.C.

---

apply to cases arising from conduct that predated the amendments, even if the qui tam relator files his or her complaint after their effective date.   *See Antoon*, 786 F.3d at 615. Defendants rely on the earlier version of the statute and the Court concludes this is the appropriate version because the conduct on which Ms. Guzall bases her FCA claims occurred before March 2010.   In any event, Ms. Guzall has not argued that the 2010 amendments apply.

[11] The 2010 amendments to § 3730 removed the jurisdictional language of the public disclosure bar.   Courts have interpreted the amendment as transforming the

§ 3730(e)(4)(A) (1986).

Defendants assert that the fraudulent conduct Ms. Guzall alleges in her Amended Complaint was publicly disclosed through the Michigan State Police investigation of the City, which was reported in the media. Ms. Guzall does not contradict Defendants' assertion. Instead, she argues she is the original source of the information.

Congress has defined an "original source" as someone "who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B) (1986). The statute's reference to "Government" means the "*federal* government." *See Antoon*, 788 F.3d at 617 (citing *United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 334-35 (6th Cir. 1998)). Not only must the relator have provided information to the federal government prior to filing her FCA lawsuit, she "must also provide the government with the information upon which the allegations are based prior to any public disclosure." *Poteet*, 552 F.3d at 515 (quoting *Jones*, 160 F.3d at 333-34) (brackets, ellipsis, and additional citation

---

public disclosure bar from a jurisdictional bar to an affirmative defense. *See, e.g., United States ex rel. Advocates for Basic Legality, Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 433 (6th Cir. 2016) ("The public disclosure bar is no longer jurisdictional, as every other circuit to address the question has concluded.") (citing cases).

removed).

There is no requirement "that the *qui tam* relator possess direct and independent knowledge of *all* of the vital ingredients to a fraudulent *transaction*." *Antoon*, 788 F.3d at 619 (internal quotation marks and citations omitted, emphasis in original). Nevertheless, the qui tam relator's conclusion that fraud occurred cannot be " 'based on pure speculation or conjecture.' " *Id*. at 620 (quoting *United States ex rel. Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d 516, 526 (9th Cir. 1998)). " 'Mere suspicion that there must be a false or fraudulent claim lurking around somewhere simply does not carry a relator's burden of proving that he is entitled to original source status.' " *Id*. (quoting *United States ex rel. Vuyyura v. Jadhav*, 555 F.3d 337, 353 (4th Cir. 2009)).

The evidence does not reflect that Ms. Guzall has direct and independent knowledge of a false claim made by Defendants to the federal government. Ms. Guzall only suspects that Defendants made false claims and, as mentioned earlier, it does not appear that any claims fall within the FCA's proscriptions. This is insufficient to qualify her as an original source. Moreover, there is no evidence that Ms. Guzall alerted the federal government to the alleged fraud before filing this lawsuit.

For the above reasons, the Court concludes that Ms. Guzall's retaliation claim under the FCA is subject to dismissal.

## C. False Claims Act

In Count II of her Amended Complaint, Ms. Guzall alleges that Defendants violated the FCA. For the reasons discussed above, Defendants are entitled to summary judgment with respect to this claim.

## D. RICO

In Count II, Ms. Guzall also asserts a RICO claim against Defendants. Specifically, Ms. Guzall alleges: "Defendants and other co-conspirators engaged in the illegal act of fraud against the United States Government in violation of 18 U.S.C.A. § 371 (RICO) Racketeer Influenced and Corrupt Organizations Act, and 26 USCA [sic] 7201 …" (Am. Compl. ¶ 232, ECF No. 4 at Pg ID 142.)

RICO's civil enforcement scheme includes the following provision for private lawsuits:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]

18 U.S.C. § 1964(d). A plaintiff has standing to assert a RICO claim, and can only recover to the extent that, "he has been injured in *his* business or property by the conduct constituting the [RICO] violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (emphasis added). "[B]oth personal injuries and pecuniary losses flowing from those personal injuries fail to confer relief under § 1964(c)." *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 565-66 (6th Cir.

2013) (citations omitted). Defendants seek summary judgment with respect to Ms. Guzall's RICO claim, arguing, in part, that she fails to demonstrate an injury sufficient to grant her RICO standing.

In response to Defendants' summary judgment motions, Ms. Guzall does not identify an injury to her business or property resulting from Defendants' asserted RICO activity. Ms. Guzall responds only with a quotation from and citation to case law indicating that indirect injuries confer standing. (*See, e.g.*, Pl.'s Resp. to City's Mot. at 38-39, ECF No. 157 at Pg ID 3126-27, quoting *Cty. of Oakland by Kuhn v. City of Detroit*, 784 F. Supp. 1275, 1283-84 (E.D. Mich. 1992)); *but see Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) (holding that the injury required to confer RICO standing can be neither remote, purely contingent, nor indirect). Nevertheless, Ms. Guzall never identifies the indirect injury she suffered to her business or personal property.

To the extent Ms. Guzall is asserting an indirect injury due to Defendants' alleged "bilking the U.S. Federal Government out of tens of thousands of dollars" in tax revenue (*see* Am. Compl. ¶ 234), this is insufficient to confer standing. *See Illinois ex rel. Ryan v. Brown*, 227 F.3d 1042, 1045-46 (7th Cir. 2000) (holding that the plaintiff, a taxpayer whose asserted injury was based upon the state's lost revenue following the misappropriation of government funds, lacked standing); *Amsterdam Tobacco Inc. v. Philip Morris Inc.*, 107 F.Supp.2d 210, 219-20

(S.D.N.Y. 2000) ("Where, as here, the primary purpose of an alleged racketeering enterprise is to avoid paying taxes or otherwise defraud the government, indirectly injured parties do not have standing to bring RICO claims."); *see also Anza*, 547 U.S. at 458 (holding that the defendant's act of lowering prices was entirely distinct from its alleged RICO fraud of not charging sales tax, which defrauded the State of New York, not the plaintiff, a competitor company of defendant).   While taxpayers and residents in general may be indirectly harmed by RICO conduct wasting a city's funds or depriving the government of tax revenue, these are not sufficiently direct injuries to sustain a RICO action.   As the Supreme Court has held, standing cannot be premised upon such "generalized grievance[s]" that are "plainly undifferentiated and common to all members of the public."   *United States v. Richardson*, 418 U.S. 166, 176-77 (1974).

Because Ms. Guzall fails to establish that she has standing to bring her RICO claim, Defendants are entitled to summary judgment with respect to this claim.

### E.    Promissory Estoppel

In Count III of the Amended Complaint, Ms. Guzall asserts a promissory estoppel claim based on Defendants' alleged promises that she would not be laid off and, when she was, that she would be returned to work with the City.

Under Michigan law, a claim for promissory estoppel has four elements: " '(1) a promise, (2) that the promisor should reasonably have expected to induce

action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or forbearance of that nature, (4) in circumstances such that the promise must be enforced if injustice is to be avoided.' " *Gason v. Dow Corning Corp.*, -- F. App'x --, 2017 WL 65564, at *5 (6th Cir. Jan. 6, 2017) (quoting *Leila Hosp. & Health Ctr. v. Xonics Med. Sys., Inc.*, 948 F.2d 271, 275 (6th Cir. 1991)) (additional citations omitted). " 'The doctrine of promissory estoppel is cautiously applied[.]' " *Id.* (quoting *Marrero v. McDonnell Douglas Capital Corp.*, 505 N.W.2d 275, 278 (Mich. Ct. App. 1993) (per curiam)). To be actionable, the promise must be clear and definite. *DBI Investments, LLC v. Blavin*, 617 F. App'x 374, 385 (6th Cir. 2015) (citing *State Bank of Standish v. Curry*, 500 N.W.2d 104, 108 (Mich. 1993)). The Michigan Supreme Court has "emphasized that 'the reliance interest protected by promissory estoppel is *reasonable reliance*.' " *Id.* (quoting *Curry*, 500 N.W.2d at 107) (emphasis in original and brackets removed). Defendants argue that Ms. Guzall cannot establish any of the elements necessary to prevail on her promissory estoppel claim.

In fact, the Court finds no evidence of a clear and definite promise by Defendants that Ms. Guzall would keep her job. Ms. Guzall relates Mayor Lambert's and Ms. Krampitz's promises that she would not be laid off; however, these promises were made when Ms. Guzall returned from vacation in March 2010, during the first round of layoffs when she in fact was not laid off. (12/4/15 Guzall

Dep. at 83, 139.)   With respect to any promise to bring her back to work, even if it was reasonable for Ms. Guzall to rely on those promises, she fails to explain how she detrimentally relied on Defendants' promises.

Defendants therefore are entitled to summary judgment with respect to Ms. Guzall's promissory estoppel claim.

### F.      Due Process Violation

In Count IV of her Amended Complaint, Ms. Guzall alleges that Defendants did not afford her due process consistent with the Fourteenth Amendment of the United States Constitution when she was laid off.

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Id*. at 577; *Chilingirian v. Boris*, 882 F.2d 200, 203 (6th Cir. 1989).

In Michigan, employment contracts for an indefinite term are presumed to be at-will and may be terminated by either party at any time for any reason.  *Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 597 (Mich. 1993) (citation omitted); *see also Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 766 (6th Cir. 2010) (citing *Lytle v.*

*Malady*, 579 N.W.2d 906-910-11 (Mich. 1998) ("Michigan law generally presumes that employment relationships are 'at-will' arrangements; at-will employees, in turn, have no property interest in their continued employment."). The Sixth Circuit has concluded that "a public employee does not have a property interest in continued employment when his position is held at the will and pleasure of his superiors and when he has not been promised that he will only be terminated for good cause." *Chilingirian*, 882 F.2d at 203 (citations omitted). Nevertheless, a party may overcome the presumption of at-will employment in one of three ways:

> "(1) proof of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause; (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a legitimate expectation of job security in the employee."

*Pucci*, 628 F.3d at 766 (quoting *Lytle*, 579 N.W.2d at 911).

It is undisputed that Ms. Guzall held her position with the City at the pleasure of Mayor Lambert, who hired her for the position. (12/4/15 Guzall Dep. at 31.) Ms. Guzall nevertheless claims that she was a just-cause employee based on statements by Ms. Krampitz and the City's finance and human resources directors, Ms. Hoffman and Ms. Mayerich, respectively. (12/4/15 Guzall Dep. at 28.) According to Ms. Guzall, these individuals told her that "[her] job was protected by the city charter[,]" specifically the provision stating that the mayor shall have a secretary. (*Id*. at 28-29.) These statements are not sufficient to overcome the

presumption that Ms. Guzall's position was at-will.

The city charter reads in pertinent part: "There shall be administrative secretaries for the Mayor …" (Lambert's Mot., Ex. B, ECF No. 171-3.)   This provision simply guarantees the mayor an administrative secretary.   It does not promise the individual serving in that position job security, a definite term of employment, or forbid discharge absent cause.   Ms. Guzall does not otherwise relate a clear and unequivocal express agreement concerning her job security, identify a contractual provision forbidding her discharge absent just cause or promising her employment for a definite period, or point to a City policy or procedure instilling a legitimate expectation of job security.

In short, Ms. Guzall fails to present evidence to establish that she had a constitutionally protected interest in her position with the City.   Defendants, therefore, are entitled to summary judgment with respect to her due process claim.

## G.    Hostile Work Environment

Count IV of Ms. Guzall's Amended Complaint includes "hostile work environment" in its title and she refers to a hostile work environment in two paragraphs within this count:

> 314.    Defendants and their employees conduct and actions against Plaintiff as indicated within this Complaint and incorporated within this Count created a hostile work environment for Plaintiff, in violation of Federal law[,] the State of Michigan's Public Policy and other applicable law, substantially interfering with Plaintiff's employment, as the facts herein indicate.
>
> 315.    Defendants intentionally sought to terminate Plaintiff in accord with the facts and allegations stated herein and created a hostile working environment for Plaintiff.

(Am. Compl. ¶¶ 314-315, ECF No. 4 at Pg ID 152.)    As the remaining paragraphs of her Amended Complaint referring to a hostile work environment suggest (*id.* ¶¶ 21, 24, 98, 120), and as Ms. Guzall confirms in response to Defendants' motions, the essence of her hostile work environment claim is that she was subjected to a hostile work environment in retaliation for engaging in protected activity.    (*See, e.g.*, Pl.'s Resp. to City's Mot. at 31-35, ECF No. 157 at Pg ID 3119-23.)

The Court's first step in addressing Ms. Guzall's hostile work environment claim is determining the law on which she premises her claim.    At first glance it appears that Ms. Guzall is relying on 42 U.S.C. § 1983.    (*See id.* at 33, Pg ID 3121, quoting *Sharpe v. Cureton*, 319 F.3d 259, 267-68 (6th Cir. 2003).)    Yet, § 1983 "is a remedial statute which does not create substantive rights."    *Day v. Wayne Cty. Bd.*

*of Auditors*, 749 F.2d 1199, 1202 (6th Cir. 1984) (citing *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 616-18 (1979)).   Instead, "it provides a remedy for the violation of rights created elsewhere."   *Id.*   Thus in *Sharpe*, the plaintiffs were asserting a § 1983 claim based on the violation of their First Amendment rights.   *See Sharpe*, 319 F.3d at 261.

This Court already evaluated Ms. Guzall's ability to survive summary judgment on her First Amendment and FCA retaliation claims.   To the extent she is asserting a retaliatory harassment claim under Title VII, Ms. Guzall first must establish a prima facie case by showing: "that (1) she engaged in activity protected by Title VII"; (2) Defendants were aware of Ms. Guzall's "exercise of protected rights"; (3) Defendants subjected Ms. Guzall to "an adverse employment action" or "severe or pervasive retaliatory harassment"; and (4) "there was a causal connection between the protected activity and the adverse employment action or harassment." *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (citation omitted).

With respect to the first prong, the Sixth Circuit has explained that "there are two types of protected activity: participation in a proceeding with the Equal Employment Opportunity Commission ("EEOC") and opposition to an apparent Title VII violation [i.e., discrimination based on race, color, religion, sex, or national origin]." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012)

(citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)); *see also* 42 U.S.C. §§ 2000e–2; 2000e–3(a).   Ms. Guzall does not provide evidence of activity protected under Title VII.   None of her complaints related to race, color, religion, sex, or national origin.   Moreover, Ms. Guzall never filed an EEOC complaint.

Defendants, therefore, are entitled to summary judgment with respect to Ms. Guzall's hostile work environment claim.

## H.    Intentional Infliction of Emotional Distress

In Count V of her Amended Complaint, Ms. Guzall asserts a claim of intentional infliction of emotional distress ("IIED").   Ms. Guzall indicates in response to Defendants' motion that the claim is premised on Defendants' alleged demand that she engage in criminal acts or risk discharge.[12]

To prove this claim, Ms. Guzall must show that Defendants intentionally or

---

[12] In comparison, in her Amended Complaint, Ms. Guzall identifies the "extreme and outrageous conduct" as being "forced to go on unemployment for the first time in her life after her employment was terminated" and being "told to lie to the media by Defendants after Defendant Lambert set up an illegal blockade to stop a movie star [George Clooney] who was filming in the City" to allow Mayor Lambert to "meet that movie star."   (Am. Compl. ¶¶ 324, 332-33; ECF No. 4.)   Ms. Guzall recites caselaw within this count holding that when an employer " 'gains a position of authority over an employee and forces the latter to cho[o]se between performing a criminal act or losing his job, it cannot be said as a matter of law that such conduct is not extreme and outrageous.' "   (*Id.* ¶¶ 326, 328, quoting *Wilson v. Kiss*, 751 F. Supp. 1249, 1254 (E.D. Mich. 1990).)   Nowhere in this count, however, does Ms. Guzall allege that Defendants threatened to terminate her employment if she did not engage in a crime.

recklessly engaged in extreme and outrageous conduct that caused her severe

emotional distress. *Downing v. Life Time Fitness*, 483 F. App'x 12, 18 (6th Cir.

2012) (citing *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908 (Mich. 1985)).

In *Roberts*, the Michigan Supreme Court described "extreme and outrageous

conduct" as follows:

> It has not been enough that the defendant has acted with an intent which
> is tortious or even criminal, or that he has intended to inflict emotional
> distress, or even that his conduct has been characterized by "malice", or
> a degree of aggravation which would entitle the plaintiff to punitive
> damages for another tort. Liability has been found only where the
> conduct has been so outrageous in character, and so extreme in degree,
> as to go beyond all possible bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civilized community. Generally,
> the case is one in which the recitation of the facts to an average member
> of the community would arouse his resentment against the actor, and
> lead him to exclaim, "Outrageous!"

374 N.W.2d at 908-09. Liability does not arise from "mere insults, indignities,

threats, annoyances, petty oppressions, or other trivialities[.]" *Id*. at 908.

Moreover, the Sixth Circuit has set a high bar as to what a plaintiff must show to

satisfy the element of severe emotional distress:

> "Emotional distress passes under various names, such as mental
> suffering, mental anguish, mental or nervous shock, or the like. It
> includes all highly unpleasant mental reactions, such as fright, horror,
> grief, shame, humiliation, embarrassment, anger, chagrin,
> disappointment, worry, and nausea. It is only where it is extreme that
> the liability arises. Complete emotional tranquility is seldom attainable
> in this world, and some degree of transient and trivial emotional
> distress is a part of the price of living among people. *The law intervenes
> only where the distress inflicted is so severe that no reasonable man
> could be expected to endure it*. The intensity and the duration of the

distress are factors to be considered in determining its severity."

*Watkins v. City of Southfield*, 221 F.3d 883, 893 (6th Cir. 2000) (emphasis in original) (quoting *Pratt v. Brown Mach. Co.*, 855 F.2d 1225, 1240 (6th Cir. 1988)) (additional citations omitted).

The relationship between the parties is relevant in evaluating an IIED claim. *See Wilson v. Kiss*, 751 F. Supp. 1249, 1253 (E.D. Mich. 1990). "[T]he extreme and outrageous character of the conduct may arise from the position of the actor or a relationship to the distressed party." *Id*. (citing *Ledsinger v. Burmeister*, 318 N.W.2d 558, 562 (Mich. Ct. App. 1982). "Such conduct may occur through the abuse of a relationship that puts the defendant in a position of actual or apparent authority over a plaintiff or gives a defendant power to affect a plaintiff's interest." *Id*. (citing *Margita v. Diamond Mortg. Co.*, 406 N.W.2d 268, 272 (Mich. Ct. App. 1987)). Thus in *Wilson*, the court denied the defendant's motion to dismiss the plaintiff's IIED claim alleging that "defendant utilized his authoritative position as employer to demand that plaintiff engage in criminal acts or risk discharge." *Wilson*, 751 F. Supp. at 1254.

Defendants seek summary judgment with respect to Ms. Guzall's IIED claim, arguing in part that she fails to prove extreme and outrageous conduct or that the

alleged conduct caused her severe emotional distress.[13]   First, the Court agrees with

Defendants that Ms. Guzall fails to identify a specific statement by Defendants

threatening her job if she did not engage in criminal conduct; and, as discussed

earlier, there is no evidence that she was laid off in retaliation for her refusal to

commit a criminal act.   Second, Ms. Guzall presents no evidence in response to

Defendants' motions to show that she suffered emotional distress because of the

alleged extreme and outrageous conduct.   As set forth in Section I, to survive

summary judgment, Ms. Guzall must set forth specific facts—that is, specifically

designate in the record where the facts are established—to demonstrate a genuine

issue of material fact for trial.   *See, e.g., Matsushita Elec. Indus. Co.*, 475 U.S. at

---

[13] The City and Mayor Lambert also argue that they are immune from liability with
respect to Ms. Guzall's IIED claim under Michigan's governmental immunity from
tort liability provision, Mich. Comp. Laws § 691.1407.   This Court finds it
unnecessary to address this defense.   The Court notes, however, that Ms. Guzall is
incorrect when she asserts that this immunity does not extend to these defendants'
intentional torts or where they acted in bad faith or with malice.   The law on which
Ms. Guzall relies for this assertion—to the extent it remains good law—does not
apply to the immunity afforded a governmental agency (i.e., the City) or the elective
or highest appointive executive official (i.e., Mayor Lambert). *See Am.
Transmissions, Inc. v. Attorney General*, 560 N.W.2d 52 (Mich. 1997) (citing *Ross
v. Consumers Power Co.*, 363 N.W.2d 641 (Mich. 1984)) ("[T]he highest executive
officials of all levels of government are *absolutely* immune from *all* tort liability
whenever they are acting within their executive authority.") (emphasis added);
*Smith v. Dep't of Pub. Health*, 410 N.W.2d 749, 776 (Mich. 1987); *see also Ross v.
Consumers Power Co.*, 363 N.W.2d 641, 667-68 (Mich. 1984) (outlining the
different tort immunity Michigan extends to "judges, legislators, and the highest
executive officials of all level of government" as opposed to "[l]ower level official,
employees, and agents").

587; *Liberty Lobby*, 477 U.S. at 252.   Ms. Guzall does not even respond to Defendants' arguments, let alone identify where in the record there is proof of her severe emotional distress.   The issue, therefore, is deemed waived.   *See Williams v. WCI Steel Co.*, 170 F.3d 598, 607 (6th Cir. 1999) (finding, on appeal, that plaintiff waived state law claims in district court by failing to present any opposition to defendant's argument concerning the state law claims.

### I.     Fraud

Count VI of Ms. Guzall's Amended Complaint is titled "Fraud – Intentional and/or Constructive Fraud – Conspiracy and Concert of Actions."   (Am. Compl. at 46, ECF No. 4 at Pg ID 156.)   Nowhere within the allegations of this count does Ms. Guzall identify the fraud Defendants allegedly committed against her.   (*Id.* ¶¶ 338-412.)   Instead, she refers to fraud committed against the federal government—the merits of which the Court already addressed with respect to her FCA charge.   In response to Defendants' summary judgment motions, Ms. Guzall asserts that this claim is premised on the same assurances about her job security as her promissory estoppel claim.   (*See, e.g.*, Pl.'s Resp. Krampitz Mot. at 39-40, ECF No. 158 at Pg ID 3370-71.)

To support a claim of fraud under Michigan law, Ms. Guzall must satisfy the following elements:

1. The defendant made a material representation.

2. The representation was false.

3. When the defendant made the representation, it knew that it was false, or the defendant made the representation recklessly, without any knowledge of its truth, and as a positive assertion.

4. The defendant made the representation with the intention that it should be acted on by the plaintiff.

5. The plaintiff acted in reliance on the representation.

6. The plaintiff suffered injury due to his reliance on the representation.

*Hord v. Envtl. Research Inst. of Michigan*, 617 N.W.2d 543, 546 (Mich. 2000).

The plaintiff's reliance on the material misrepresentation must be reasonable.

*Foreman v. Foreman*, 701 N.W.2d 167, 175 (Mich. Ct. App. 2005) (citations omitted).   Ms. Guzall fails to establish the necessary elements of her fraud claim.

First, she fails to present evidence to demonstrate that any statement regarding her job security (i.e., that she would not be laid off and would be returned to work once she was) was false when made.   Moreover, Ms. Guzall fails to explain how she acted in reliance on the representations.   Finally, she fails to identify any injury she suffered because of this reliance.

As Ms. Guzall fails to show evidence of fraud, her related conspiracy claim also is subject to dismissal.   This is because a civil conspiracy claim is not actionable standing alone; it is necessary to prove a separate actionable tort underlying the conspiracy.   *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich. Ct. App. 2003) (quoting *Early Detection*

*Ctr., PC v. New York Life Ins. Co.*, 403 N.W.2d 830 (1986)) (" '[A] claim for civil

conspiracy may not exist in the air; rather, it is necessary to prove a separate,

actionable tort.' ").

## IV.    Conclusion

For the reasons set forth above, the Court holds that Defendants are entitled to

summary judgment with respect to the claims Ms. Guzall asserts against them.

Accordingly,

**IT IS ORDERED** that Defendants' motions for summary judgment (ECF

Nos. 153, 154, and 171) are **GRANTED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: August 8, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of
record and/or pro se parties on this date, August 8, 2017, by electronic and/or U.S.
First Class mail.

s/ R. Loury
Case Manager